# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 11 2019, 7:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James C. Spencer
Dattilo Law Office
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of Cam.L., Father, E.W., Mother,[1] and C.L., Child,

Cam.L.,

*Appellant-Respondent,*

v.

March 11, 2019

Court of Appeals Case No.
18A-JT-2019

Appeal from the
Jefferson Circuit Court

The Honorable
Darrell M. Auxier, Judge

Trial Court Cause No.
39C01-1711-JT-44

---

[1] We note that the juvenile court also terminated Mother's parental rights to C.L. Although Mother does not participate in this appeal, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court is a party on appeal.

Indiana Department of Child
Services,

*Appellee-Petitioner*.

**Kirsch, Judge.**

Cam.L. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child C.L. ("Child"). Father raises the following consolidated and restated issue for our review: whether the juvenile court's judgment terminating his parental rights was supported by clear and convincing evidence.

We affirm.

## Facts and Procedural History[2]

E.W. ("Mother") and Father (together, "Parents") are the biological parents of Child, who was born in Kentucky on January 2, 2014. When Child was four months old, the Kentucky Department of Child Services ("KDCS") removed Child from Mother's care after discovering she was using illegal drugs. The

---

[2] Because Mother does not appeal, we set forth only those facts necessary to Father's appeal.

KDCS then granted Father sole custody of Child. Sometime before August 2014, Father moved with Child to Indiana, and soon thereafter, Mother also moved to Indiana. Father cared for Child from age four months until she was about one year old and allowed Mother to have unsupervised visitation with Child, even though he knew that Mother had a pattern of drug use—doing "well for a little while" and then having setbacks. *Tr. Vol. II* at 50. Father was arrested for dealing in methamphetamine in October 2015, which was the last time Child was in Father's custody and care. With Father in prison, Mother began caring for Child without a custody order.

[4] Mother became involved with the Indiana Department of Child Services ("DCS") in July 2016, when, in the middle of the night, she went with Child to Jefferson County local law enforcement, telling them that she had ingested methamphetamine and needed help. Mother refused to identify relatives who might care for Child, and it is unclear whether she identified Father. Regardless, Father was incarcerated due to a conviction for dealing in methamphetamine and would have been unable to care for Child. Accordingly, that night, Child was placed in the home of Foster Parents, where she has since resided.

[5] On July 5, 2016, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). DCS referred Mother to services, including visitation with Child and substance abuse counseling. Mother participated for a couple of months before telling DCS Family Case Manager Kelsey Smitha ("FCM Smitha") that Child was "better off" without Mother in her life. *Id.* at 25.

Child was adjudicated to be a CHINS on August 29, 2016, which was also the last day that Mother had contact with DCS or with Child. *Id*. at 26.

[6] In October 2016, the month that Father was released from incarceration, the CHINS court entered a dispositional order formally removing Child from Parents' care and granting wardship of Child to DCS. In that order, Parents were ordered to: (1) attend therapy; (2) complete a substance abuse assessment; (3) submit to random drug screens; (4) find suitable housing for themselves and Child; and (5) achieve and maintain overall stability. *Appellant's App. Vol. III* at 4. The permanency plan was reunification. In late December 2016, Father participated in supervised visitation twice a week for two hours each visit. There were no issues during Father's visits with Child. Around that time, Father was referred to Centerstone for substance abuse counseling.

[7] In January 2017, Father had a substance abuse assessment and attended a few outpatient therapy appointments. While participating in random drug screening, Father tested positive for methamphetamine on January 31, 2017, tested positive for THC on February 17, 2017, and refused a drug screen in March 2017. *Id.* at 27-28. In mid-March 2017, Father was arrested and charged with dealing in methamphetamine. *Id*. at 28. At that time, Father was on probation for a prior methamphetamine-related conviction. Since March 2016, Father has been convicted of three felonies relating to possessing or dealing in methamphetamine. *Appellant's App. Vol. III* at 5-6. Based on this evidence, the juvenile court concluded that Father "was actively engaged in methamphetamine use during this time period." *Id*. at 5.

[8]     In June 2017, DCS changed Child's plan from reunification to termination of Parents' parental rights, and in November 2017, DCS filed a petition to terminate Mother's and Father's parental rights. On May 25, 2018, the juvenile court held a fact-finding hearing on the petition.[3] Father, who was then thirty-three years old, testified that he had been "drinking [alcohol] and smoking weed since [he] was ten," and that he had been using methamphetamine since he was thirty years old. *Tr. Vol. II* at 44, 59. When asked who introduced him to methamphetamine, Father said it was his ex-girlfriend, who was the mother of an older son, for whom "[Father] signed rights over." *Id*. at 59.

[9]     Court-appointed special advocate Linda Zapp ("CASA Zapp") testified that she had worked with Child since April 2017, when Child was three years old. *Id*. at 7. At that time, Mother had not had contact with DCS or Child for at least six months, and Father was incarcerated. Child was living with Foster Parents, and her paternal grandparents ("Grandparents") were also involved in her life. *Id*. CASA Zapp said that she had never spoken with Mother and had only spoken with Father during court proceedings. *Id*. at 8. CASA Zapp testified that Child was "pretty reserved" but was more engaging in the company of Foster Parents than she was with Grandparents or at daycare. *Id*. at 9. Foster Parents had three other adopted children, and CASA Zapp said that Child

---

[3] Prior to the termination fact-finding hearing, DCS made a diligent effort to locate Mother, but without success. Accordingly, DCS notified Mother about the hearing through publication in the Madison Courier. *Appellant's App. Vol. III* at 5. Mother did not appear at the fact-finding hearing, and her whereabouts were unknown. *Id.*

would play and laugh with those children. *Id*. CASA Zapp said that Child was very intelligent and was above the target for her age with speech and language skills. *Id*. She also testified that Child, who had been with Foster Parents for two years, was close to them and their children. *Id*. at 10. Noting that Father was incarcerated, Mother had lost touch with Child and DCS, and Foster Parents provided permanency and were excellent caregivers, CASA Zapp recommended that it was in Child's best interest that Parents' rights be terminated, and that Child remain with, and be adopted by, Foster Parents. *Id*.

[10] Beth Mink ("Mink"), a Family Support Specialist for Centerstone, testified that she began working with Child through a referral from DCS. *Id.* at 14. Mink facilitated the visitation between Father and Child, which began in January 2017 and ended in March 2017, when Father was arrested. *Id*. at 14-15. The visits, which were two hours in length, occurred two times a week and were held either at Centerstone or a nearby McDonald's. *Id*. Father missed only one visit—when he was working third shift and overslept—and was forty minutes late to a second visit. Father brought Child snacks to the meeting or bought her food at McDonald's. *Id*. at 15. Mink said that the visits went well, and although Child was shy, she and Father were engaged during the visits. At the time of the May 25, 2018 hearing, Mink had not seen Child since March 2017, when Child was three years old. *Id*. at 17.

[11] FCM Smitha said she had been with the case since July 2016, when Child was brought to the police station by Mother who said she had taken methamphetamine and needed help. *Id*. at 25. FCM Smitha testified that the

CHINS court had ordered Parents to participate in substance abuse services, visitation with Child, and maintain contact with FCM Smitha. Parents were also ordered to obtain and keep stable income and stable housing. *Id*. at 26. The last time FCM Smitha saw Mother was on August 29, 2016, when Mother said that Child was better off without Mother in her life. *Id*. at 25.

[12] FCM Smitha testified that Father was released from incarceration in October 2016, got a job, and kept fairly consistent contact with DCS. In early January 2017, Father participated in a substance abuse assessment, prompting DCS to recommend that Father participate in out-patient addiction services and therapy, and work with a therapy coach. FCM Smitha testified that Father "began going downhill" in late January. *Tr. Vol. II* at 38. Father tested positive for methamphetamine screen on January 31, 2017, and THC on February 17, 2017. *Id*. at 38. On March 7, 2017, Father informed a DCS case manager, who was overseeing the termination of his parental rights to another of his children, that he would no longer be working toward services for reunification with that child, and he would no longer submit to screening for either that child or Child. At this time the permanency plan was changed from reunification to termination.

[13] At the time of the fact-finding hearing, Child was four years old and living with Foster Parents. *Id*. at 30. FCM Smitha testified that Child is intelligent, well spoken, and has bonded with Foster Parents and their children. *Id*. at 31. Child is also doing "extremely well" in the daycare environment. *Id*. FCM Smitha testified that the continuation of the parent-child relationship poses a

threat to Child and the reasons for Child's removal from Father will not be remedied; Father is a repeat offender and has been in and out of prison and, thus, in and out of Child's life. *Id.* at 32. She said that it was in Child's best interest that Parents' parental rights to Child be terminated, and that Child should remain with Foster Parents. *Id.* at 30, 32. FCM Smitha testified that the satisfactory plan for the care and treatment of Child would be adoption by Foster Parents. *Id.* at 35.

[14] Heath Williams ("Williams"), a recovery coach with Centerstone, testified that he helped people with addictions achieve and maintain sobriety. Williams said that he helped clients get a job, find a place to live, and rebuild relationships. *Id.* at 22. He explained that DCS referred him to work as Father's recovery coach; however, Williams was never able to meet with Father because he did not know Father's whereabouts. *Id.* at 23. After trying to reach Father for ninety days, the case was closed.

[15] Father testified that he was in prison at the time Child was placed with Foster Parents. Father acknowledged that it was DCS's recommendation that he participate in "therapy counseling" and work with Williams. However, Father said, he "tried to contact [Williams] through the phone number [he] received but then wasn't able to manage any contact through the phone." *Id.* at 44. While stating that he was sober the entire time he lived in Kentucky, including when he was granted custody of Child, Father admitted he had made no progress in "relapse prevention" and had struggled with substance abuse for a long time. *Id.* at 44, 60. Father began using alcohol and marijuana at age ten,

and at age thirty, he started using methamphetamine. *Id*. Father testified that his criminal history included drug-related offenses, as well as convictions for disorderly conduct and misdemeanor charges. *Id*. at 45. At the close of the evidence, the juvenile court took the matter under advisement. In July 2018, the juvenile court entered an order, containing numerous findings of fact and conclusions thereon, terminating Father's parental rights to Child. Father now appeals.

## Discussion and Decision

[16] Father contends that the juvenile court erred in terminating his parental rights to Child. "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, the law allows for termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Thus, "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *In Re W.M.L.*, 82 N.E.3d 361, 365 (Ind. Ct. App. 2017). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re T.F.*, 743 N.E.2d at 773. Termination of parental rights is

proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship. *Id.*

[17] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that most favor the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[18] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

(B)  that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  that termination is in the best interests of the child; and

(D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof is one of clear and convincing evidence.  *Matter of G.M.*, 71 N.E.3d 898, 904-05 (Ind. Ct. App. 2017).  Moreover, if the juvenile court finds that the allegations in a petition are true, it *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a) (emphasis added).

Father challenges three of the juvenile court's findings, contending that those findings are not supported by clear and convincing evidence.  Regarding

Finding 25, Father contends that it was error for the juvenile court to find, "Father was aware Mother had a substance abuse problem, however, Father took no active steps to attempt to address the problem with Mother or to remove [C]hild from Mother's care." *Appellant's App. Vol. III* at 7. Father argues that he could not have known of Mother's problem with drugs because, as the evidence showed, he had very little contact with Mother. *Appellant's Br.* at 10-11. While it may be true that Father was unaware of Mother's drug use on any given day, his own words belie his claim that he did not know about Mother's persistent drug problems; Father himself admitted that Mother "would do well for a little while and then she would fall back off. . . . [T]hat's the only pattern I've known of her." *Tr. Vol. II* at 50. The evidence was sufficient to support the finding that Father was aware that Mother had a substance abuse problem; this finding was supported by clear and convincing evidence.

[21]     Father next challenges Finding 28, contending that it was mere speculation for the juvenile court to find that he "never made progress towards sobriety when he has been out of incarceration," and "[t]here is a substantial likelihood that [Father] will relapse after his release." *Appellant's Br.* at 12; *Appellant's App. Vol. III* at 7. Contrary to Father's assertion, this finding was supported by clear and convincing evidence. Father has used marijuana and alcohol since he was ten years old, and he has a prior conviction for possession of marijuana. In 2014, the year Child was born, Father *began* to use methamphetamine, and he was arrested in 2015 for dealing methamphetamine. Following his December 2016

release from prison, Father resumed his use of illegal drugs. Within three months of his release, Father had tested positive for methamphetamine and THC, and, again, had been arrested for dealing methamphetamine. Additionally, although Father had participated in DOC's Therapeutic Community/Purposeful Incarceration program for eight months, he did not seem to recognize that his drug use impeded his ability to provide for, protect, and supervise Child. When asked, "[W]ould you say that . . . substance abuse issues have affected your ability to parent [C]hild[,]" Father merely said, "Due to incarceration, yes." *Tr. Vol. II* at 45. Here, the evidence was sufficient to support the finding, that Father "never made progress towards sobriety when he has been out of incarceration," and there is "a substantial likelihood that [Father] will relapse after his release." *Appellant's App. Vol. III* at 7.

[22] Finally, Father challenges Finding 30 that "[i]t is likely, given the length of time and lack of involvement, that there is little or no bond between Father and Child." *Id.* at 8. Father argues that there was such a bond and that Finding 30 did not take into consideration that: (1) Father alone cared for Child from the time she was four months old until she was one year old; (2) Father had two-hour visits with Child, twice weekly, from January 2017 until he was arrested in March 2017; and (3) Child is close with Father's family. Here, the question is not whether this court believes there is a bond between Father and Child; instead, the question is whether the juvenile court's finding was supported by clear and convincing evidence. The juvenile court heard evidence about Father caring for Child, visiting with Child, and that Child was close to paternal

family. The juvenile court also heard that Father started using methamphetamine at the age of thirty, which was the same year that Child was born. At the time of the hearing, Child was four years old and, Father, as a result of his own actions, had been incarcerated and unavailable to Child for more than three of those four years. During the termination proceedings for Child, Father was also involved in termination proceedings for another one of his children. On appeal, we do not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d at 149. Based on this evidence, we cannot say that this finding about lack of bonding was clearly erroneous.

[23] Father does not challenge the remaining findings of fact, and therefore we will accept them as true. *See In re Involuntary Termination of Parent–Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (concluding that parent's failure to specifically challenge trial court's findings resulted in waiver of her argument that findings were clearly erroneous), *trans. denied*. Therefore, where the unchallenged findings support the judgment, we will affirm. *Kitchell v. Franklin*, 26 N.E.3d 1050, 1059 (Ind. Ct. App. 2015) (affirming where unchallenged findings supported trial court's judgment), *trans. denied*.

[24] Father contends that the juvenile court erred in finding that DCS met its burden to prove there was a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside of the home would not be remedied. Father points to the evidence that he was the sole caregiver of Child from the time she was four months old until she was one year old, and that upon his release from prison, he immediately contacted DCS and "productively

engaged in services." *Appellant's Br.* at 12. Furthermore, visitations with Child went well; the two interacted, played together, and enjoyed each other's company. *Id.* Father maintains that he was on the verge of being released from incarceration and should have been given the opportunity to parent Child.

[25] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct.

App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.*, 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.*, 942 N.E.2d at 873.

[26] Here, the condition that led to Child's removal was Mother's admission to local law enforcement that she had ingested methamphetamine and needed help with Child. Father, however, was also unable to care for Child because he was incarcerated for dealing methamphetamine at that time. DCS presented evidence from which the juvenile court made the following findings which Father does not challenge. Father used methamphetamine when Child was in his care. *Appellant's App. Vol. III* at 6. Father has "been in and out of incarceration for most of the Child's life" and has been incarcerated for all but six months since October 2015. *Id*. "Father only engaged in services offered by DCS between his incarcerations of December 2016 to March 2017. Even during this time, Father did not fully comply with the services offered." *Id*. Father has not financially provided for Child since Child was about one year old. *Id*. at 7. Father has not demonstrated stability or consistency throughout his adult life, and his criminal history spans time both before and after Child was born. *Id*. Notwithstanding the fact that Father was part of a termination proceeding for another of his children, he stated that "he had never seriously sought treatment for his substance abuse because he never had a reason to." *Id*.

"Father's habitual pattern of incarcerations makes it likely that he will lack the ability to parent the Child due to probable future incarcerations." *Id*. at 8.

[27] DCS is not required to rule out all possibilities of change; it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Also, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's placement outside the home would not be remedied.[4]

---

[4] We need not address Father's challenge to the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[28] Father also challenges the trial court's conclusion that termination of his parental rights is in the best interests of Child. In deciding whether the termination of parental rights is in the best interests of a child, the juvenile court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*. In making that determination, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id.* The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id*.

[29] Father contends that the trial court erred in concluding that termination of his parental rights was in Child's best interest because that judgment was "based on factual findings that were not supported by clear and convincing evidence." *Appellant's Br*. at 10. This argument must fail because, as discussed above, Findings 25, 28, and 30 were all supported by clear and convincing evidence, and Father does not challenge the rest of the findings.

[30] Father also argues that our Supreme Court's reasoning in *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009) supports his position that the termination of parental rights was not in Child's best interests. *Appellant's Br*. at 13. In *G.Y.*, the Supreme Court addressed whether it was in the child's best interests to delay termination of mother's parental rights to allow her time until she could be released from jail and "try to remedy conditions" regarding child. *In re G.Y.*, 904 N.E.2d at 1263. DCS argued that such a wait would "put [child] on the shelf," instead of pursuing the paramount goal of permanency. *Id*. This court disagreed and found it was in the child's best interest to wait for mother to pursue services

after her release. Here, Father argues that, like *G.Y.*, it was in Child's best interests to delay the termination of Father's parental rights until he could be released from incarceration and pursue services. Finding *G.Y.* distinguishable, we disagree.

[31] In *G.Y.*, child was a ward of DCS only because mother was unsuccessful in finding relatives to care for the child while Mother was incarcerated on a case that occurred *before* child's birth. *Id.* at 1258 (emphasis added). Mother had participated in regular weekly visits even while incarcerated. *Id.* at 1261. From the outset, no one had alleged that mother lacked parenting skills or was living an unstable lifestyle. *Id.* at 1262. Additionally, mother had made a good-faith effort to complete the required services available to her in prison; she had completed a drug treatment class, engaged in individualized drug counseling, and completed a parenting class. *Id.* at 1263. In prison, Mother had completed her associate degree and planned to complete a bachelor's degree. *Id.* at 1264. *G.Y.* does not undermine the juvenile court's conclusion here that termination of Father's parental rights was in Child's best interests.

[32] CASA Zapp said that Child used to suffer from separation anxiety but is becoming more comfortable. *Tr. Vol. II* at 10. Child plays and laughs with other children and has become more engaging. *Id.* at 9. FCM Smitha testified that Child was placed with Foster Parents in July 2015 at age one, and she has remained with them ever since. *Id.* at 30, 31. Child is doing extremely well at home with Foster Parents. *Id.* at 31. She is intelligent, well spoken, and has bonded to Foster Parents and their children. *Id.* CASA Zapp and FCM Smitha

each testified that termination of Father's parental rights was in Child's best interests. *Id*. at 10, 32. We have previously held that "recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination of parental rights is in a child's best interests." *In re A.S.*, 17 N.E.3d at 1006.

[33] Here, the totality of the evidence clearly supports the juvenile court's conclusion that termination of Father's parental relationship with Child was in Child's best interests. Father's drug addiction, criminal activities, and failure to comply with court-ordered services underscore his historic inability to provide a suitable, stable home environment and his continuing inability to do so. A parent's failure to demonstrate an ability to effectively use the services recommended to him is sufficient to demonstrate that termination is in the child's best interests. *See In re T.F.*, 743 N.E.2d at 776.

[34] Finally, Father argues that the juvenile court erred in concluding that adoption is a satisfactory plan for the care and treatment of Child. *Appellant's Br*. at 13. Specifically, he contends that DCS's two-pronged approach—to allow Foster Parents to adopt Child yet keep Father's family in the visitation process—will be "confusing and puzzling to Child as she grows older." *Id*. at 14. "Indiana courts have traditionally held that for a plan to be 'satisfactory,' for the purposes of the termination statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d at 1007 (quoting *Lang*, 861

N.E.2d at 375). A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the child. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id.* Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the child. *Id.* Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate. *Id.* (citing *In re D.J.,* 755 N.E.2d 679, 685 (Ind. Ct. App. 2001), *trans. denied*). In the present case, DCS offered the plan of adoption. The juvenile court did not clearly err in concluding DCS had a satisfactory plan for Child's care and treatment.

[35] Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[36] Affirmed.

Riley, J., and Robb, J., concur.