## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 09 2020, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan T. Feavel
Feavel & Porter, LLP
Vincennes, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Involuntary Termination of the Parent-Child Relationship of:

J.P. (Minor Child),

And

S.P. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

March 9, 2020

Court of Appeals Case No.
19A-JT-2234

Appeal from the Daviess Circuit Court

The Honorable Gregory A. Smith Judge

Trial Court Cause No.
14C01-1901-JT-3

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, S.P. (Mother), appeals the trial court's Order terminating her parental rights to her minor child, J.P. (Child).

We affirm.

# ISSUES

Mother presents the court with three issues, which we consolidate and restate as the following two issues:

> (1) Whether Mother's due process rights were violated when the Department of Child Services (DCS) filed a petition seeking to terminate her parental rights more than six months after a child in need of services (CHINS) dispositional decree was entered; and

> (2) Whether the trial court's Order terminating Mother's parental rights to Child was supported by the evidence.

# FACTS AND PROCEDURAL HISTORY

Child was born to Mother and C.L. (Father)[1] on June 27, 2010. In November 2015, Child was removed from Mother's care and adjudicated a CHINS after Mother retrieved her from daycare and drove while intoxicated. In November

---

[1] On May 29, 2019, Father voluntarily relinquished his parental rights and consented to Child's adoption. Father is not a party to this appeal.

2016 after Mother's completion of substance abuse treatment and work with a parenting aide, Child was returned to Mother. Mother did not pursue any substance abuse or alcohol treatment after Child was returned to her.

[5] On December 8, 2017, DCS Family Case Manager Pamela Padgett (FCM Padgett) went to Mother's home to investigate reports that Mother was abusing drugs, she was allowing others to use drugs in the home, she was allowing a registered sex offender to stay in the home and spend time around Child, and Child was not attending school regularly. Mother admitted that she was under the influence of an illegal substance, and FCM Padgett confirmed that a registered sex offender spent time in the home, something which did not appear to FCM Padgett to concern Mother. Mother entered into an informal adjustment with DCS pursuant to which Mother agreed to undergo a substance abuse evaluation, follow treatment recommendations, and work with a parenting aide. Mother underwent a substance abuse evaluation and was referred to out-patient treatment at the Samaritan Center, but she did not attend. Mother was next referred to an intensive out-patient program at Brentwood Springs, but she was discharged for non-attendance. Mother was prescribed an anti-depressant medication as part of her treatment at Brentwood Springs, but she did not take it. After her discharge from Brentwood Springs, Mother was referred again to the Samaritan Center. Mother did not engage in services there.

[6] On March 5, 2018, DCS received a report that Mother was abusing methamphetamine, prescription medication, and alcohol. On March 6, 2018,

FCM Jessica Rhoads (FCM Rhoads) interviewed Child at her school. Child reported that she made her own meals, got herself up in the morning, and readied herself for school because Mother slept a lot. Child had been late for school or absent over the preceding days. FCM Rhoads interviewed Mother, who admitted drug and alcohol use. Child was removed from Mother and placed in foster care, where she has resided with the same foster parents ever since. At the time of Child's removal, Mother was on probation for a conviction for domestic battery involving Father.

[7] On March 8, 2018, DCS filed a verified petition alleging that Child was a CHINS. On April 19, 2018, Mother admitted that she had mental health, substance abuse, housing, and employment issues that rendered Child a CHINS. On May 3, 2018, the CHINS court entered its dispositional order directing Mother to participate in substance abuse and mental health evaluations and to follow all treatment recommendations. Mother was also ordered to engage in home-based case management, parenting education, and random drug screens.

[8] Mother underwent an evaluation at the Samaritan Center and was diagnosed with alcohol dependence, methamphetamine abuse, and major depression. Mother was referred to individual and group therapy. Mother attended one individual therapy session but attended none of the group therapy sessions. Mother's services at the Samaritan Center were closed in June 2018 for nonattendance. On June 23, 2018, Mother was arrested for residential entry and criminal mischief after she broke into Father's home and destroyed some of

his property. On October 8, 2018, Mother was evaluated at LifeSprings and was referred to individual therapy and the Matrix program to address her substance abuse issues. Mother missed appointments and continued to use methamphetamine and alcohol, so she was terminated from her LifeSprings services in November 2018. Mother continued to use illegal substances through December 2018. From March 2018 to December 2018, Mother submitted twenty-six of the forty random drug screens requested of her. Out of the twenty-six screens that Mother submitted, eight tested positive for amphetamines and methamphetamine. From March 2018 to December 2018, Mother attended eleven of her thirty-three scheduled sessions with her parenting aide.

[9] After the CHINS petition was filed, Mother moved from her apartment in Washington, Indiana, to the home of the mother of her boyfriend, Chris Crays (Crays). The couple then moved into a motel, where Mother worked in exchange for a room. The couple subsequently moved to a home in Ferdinand, Indiana. Crays had a criminal record, and in November 2016, DCS had substantiated claims against him for child seduction and deviate sexual conduct with a step-child.

[10] In November 2017 during Mother's informal adjustment with DCS, she was working at a fast-food restaurant. From May 2018 to August of 2018, Mother worked at Jasper Rubber. She was discharged from Jasper Rubber after fighting with her superior. Late in the summer of 2018, Mother worked at the motel in

exchange for a room, and from October 2018 to December of 2018, Mother worked at Kimball Electronics.

[11] On December 30, 2018, Mother was arrested for domestic battery with a deadly weapon, criminal mischief, and public intoxication following an incident where Mother stabbed Crays with a paring knife and then attempted to beat in the door of the bathroom where Crays sought refuge. On January 4, 2019, DCS filed a petition to terminate Mother's parental rights to Child. On January 7, 2019, Mother was placed in a work release facility pending resolution of the criminal case against her.

[12] Mother exercised parenting time with Child during the CHINS proceedings. Her parenting time was always supervised. Mother was advised throughout the CHINS case that any increase in her parenting time was dependent on submitting clean urine screens. Mother appeared for her January 19, 2019, parenting time session with Child smelling of alcohol, prompting DCS to move sessions from the community to a DCS facility. After Mother's December 2018 criminal charges and placement in work release, parenting time was reduced to once per month with Child's therapist supervising. Mother returned to work release on February 18, 2019, after having consumed alcohol.

[13] On May 29, 2019, and July 29, 2019, the trial court held fact-finding hearings on DCS' petition to terminate Mother's parental rights. As a result of pleading guilty to violating her probation and to committing domestic battery against Crays, Mother anticipated being eligible for home detention beginning in

August 2019. If she was compliant with the terms of her home detention, Mother anticipated completing all of her sentences by the end of March 2020. Mother planned to serve her home detention in the Ferdinand apartment, where Crays was still living and his name was on the lease. Mother maintained that Crays would no longer be living there after her release, but she continued to have contact with Crays and openly questioned why DCS did not approve of her living with him. Mother felt that her criminal record and incarceration had not negatively impacted her ability to provide a stable home and effective parenting for Child. Mother acknowledged that when she was not incarcerated, she failed to make consistent progress on the issues that had caused Child's removal.

[14] Mother's Community Corrections Case Manager, Emily Meyer (CCCM Meyer), testified that Mother's compliance with the demands of work release had been "iffy" for her first three months, but that she had "really turned herself around the last two months[.]" (Transcript Vol. II, p. 220). Mother had started consistently attending her substance abuse treatment in mid-February 2019. Mother had also begun individual therapy and medication through LifeSprings two or three weeks before the first TPR hearing. CCCM Meyer acknowledged that, while Mother was compliant with work release requirements, that could change. Mother had submitted diluted urine samples in February and April 2019.

[15] Child's Permanency Case Manager Autumn Rhoads (PCM Rhoads), who had been engaged with the family since March 2018, testified that she had spoken to

Mother on numerous occasions about her continued relationship with Crays. The relationship concerned PCM Rhoads because of Crays' DCS history and the domestic violence that had occurred between Mother and him. Mother told PCM Rhoads that it was her own personal decision whether to be in a relationship with Crays. PCM Rhoads felt that Mother was not being truthful about not being in a relationship and living with Crays after she was discharged from work release and that Mother was "not putting her child first." (Tr. Vol. III, p. 12). As recently as July 10, 2019, Mother had voiced her confusion to PCM Rhoads about why DCS did not approve of her being with Crays. PCM Rhoads reported that while on work release, Mother had been fired from her job at a fast food restaurant for consuming alcohol and because Crays spent too much time there while Mother was working. It was PCM Rhoads' opinion that Mother's relationship with Crays was a barrier to moving forward to reunification with Child. It concerned PCM Rhoads that Mother had only shown improvement in the controlled environment of work release and that, when she was not in a controlled environment, she was not compliant with treatment.

[16] PCM Rhoads also testified that, at the beginning of the CHINS case, Child had not been attending school regularly, she had poor grades, and it had been debated whether Child required an individualized education plan. When PCM Rhoads had interviewed Child at the beginning of the case, Child did not feel safe and reported that Mother was not feeding her. After her placement with her foster parents, Child reported that she felt safe and that her foster parents

"let her eat every day." (Tr. Vol. III, p. 28). As of the second fact-finding hearing on the termination petition, Child's grades had improved, she did not require an education plan, and she was making friends. Child had been in her foster parents' home for sixteen months, had a routine to follow, and worried less. Child was bonded to another foster child in the home and cherished being in a big sister role. Child wished to be adopted by her foster parents. It was PCM Rhoads' opinion that adoption by the foster parents was in Child's best interests.

[17] Child's mental health counselor testified that "stability is the number one factor." (Tr. Vol. III, p. 71). She recommended no change in placement for Child. Child's Court Appointed Special Advocate Ericka Frances (CASA Frances) also felt that adoption was in Child's best interests because of Mother's lack of demonstrated history of stability outside of a controlled environment.

[18] On September 3, 2019, the trial court entered its Order terminating Mother's parental rights to Child. Among the 117 findings of fact and conclusions entered by the trial court in support of its Order were the following:

> 20. On April 20, 2018, the [c]ourt entered its Order on Pre-Trial Conference in which the [c]ourt took under advisement Mother's admission that [] Child is a [CHINS] due to Mother's mental health issues, substance abuse, and housing and unemployment instability. []

> 21. On May 9, 2018, the [c]ourt entered its Order Adjudicating [Child] a [CHINS].

* * * *

23. On May 10, 2018, the [c]ourt entered its Dispositional Order as to Mother, in which . . . Mother was ordered to (1) maintain contact with the [FCM], (2) enroll in recommended programs, (3) submit to random drug screens, (4) refrain from the use of illicit substances, (5) find suitable housing for herself and [] Child, [6] meet with medical/psychiatric personnel, as directed by the medical/psychiatric personnel and take all prescribed medications as directed, and [7] obey the law, etc. []

* * * *

26. During the course of the underlying CHINS case, Mother was referred for individual therapy, Intensive Outpatient Treatment (IOP), random drug screens, and a parent aide service to help her obtain stable housing and employment.

* * * *

41. Mother has been the subject of multiple criminal charges during the life of the underlying CHINS case.

* * * *

56. Mother has been compliant with programs through Community Corrections since approximately [April 2019] but did not demonstrate compliance with any services prior to her most recent incarceration and did not fully begin complying with services through Community Corrections until she had been incarcerated for approximately three months.

57. Mother herself acknowledged that her most recent bout of compliance is the most consistent she has been throughout the underlying CHINS case.

58. This [c]ourt has found that Mother has been, at best, only partially compliant in every Order on Periodic Case Review in the underlying CHINS action.

* * * *

60. While services were offered by DCS, Mother did not avail herself of the services recommended to facilitate reunification. Mother has not demonstrated an ability to provide a safe and stable home for [] Child.

* * * *

98. DCS' plan for [] Child is to be adopted by her current placement, with whom she has been placed for approximately [sixteen] months.

99. [] Child's needs are met in her current placement and [] Child is bonded to her foster parents.

* * * *

105. [The] CASA testified, and based on that testimony which the [c]ourt finds credible, the [c]ourt now finds:

    * * * *

    (e) That adoption is in [] Child's best interest.

(Appellant's App. Vol. II, pp. 5-9, 11-12). The trial court concluded that Child had been removed from Mother for at least six months under a dispositional decree; there was a reasonable probability that the conditions that resulted in Child's removal and continued placement outside of Mother's care would not be remedied; there was a reasonable probability that continuation of the parent-child relationship posed a threat to Child's well-being; and termination of Mother's parental rights was in Child's best interests.

[19] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Due Process*

[20] Mother contends that her procedural due process rights were violated by the timing of the filing of the petition to terminate her parental rights. When the State seeks the termination of a parent-child relationship, the manner in which it does so must comply with the requirements of the Due Process Clause. *In re H.L.*, 915 N.E.2d 145, 147 (Ind. Ct. App. 2009). The cornerstone of procedural due process is that "[t]he parent must be afforded the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.*

[21] Indiana Code section 31-35-2-4(b) sets out the pleading requirements for a petition seeking to terminate a parent's rights to a minor child and provides in relevant part as follows:

> (2) The petition must allege:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least (6) months under a dispositional decree.
>
> * * * *
>
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be child in need of services or a delinquent child[.]

Thus, the statute establishes "waiting periods to give parents time to reunify with their children, and bars DCS from seeking termination until one of those . . . periods has passed." *Matter of Bi.B.*, 69 N.E.3d 464, 465 (Ind. 2017).

[22] Here, DCS filed its termination petition almost eight months after the CHINS court entered its dispositional decree, and, in its petition, DCS alleged the waiting period set forth in subsection (b)(2)(A)(i). Mother argues that her procedural due process rights were violated because DCS could have afforded her more time and resources by waiting to file its petition under subsection (b)(2)(A)(iii). However, "the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." *James v. Pike Co.*, 759 N.E.2d 1140, 1143 (Ind. Ct. App. 2001). Here, DCS filed its petition after one of the waiting periods created by the legislature had expired. Mother argues that "[n]o witness testified to the necessity of filing pursuant to

the dispositional decree option and no unique or special circumstances appear to be present in the instant case or history[,]" although nothing in the statute requires DCS to allege any circumstance other than that six months have passed since the entering of a dispositional decree. (Appellant's Br. p. 17).

[23] Mother does not allege any true procedural irregularities depriving her of an opportunity to be heard in a meaningful time and manner in this case. *See In re H.L.*, 915 N.E.2d at 147. In addition, Mother's contention that due process accorded her a right to more time for services is unpersuasive because "a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015), *trans. denied*. Accordingly, we conclude that Mother's procedural due process rights were not violated when DCS filed its petition over six months after the CHINS court entered its dispositional decree, as permitted by statute.

## II. *Sufficiency of the Evidence*

### A. *Standard of Review*

[24] Mother argues that the trial court's Order terminating her parental rights was not supported by the evidence. It is well-settled that when reviewing the evidence supporting the termination of parental rights, we neither reweigh the evidence nor determine the credibility of witnesses. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id.* "We confine our review to two steps: whether the evidence clearly and

convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id*. We must give due regard to the trial court's opportunity to judge the credibility of witnesses firsthand, and we do not set aside the trial court's findings or judgment unless it is clearly erroneous. *Id*.

## B. *Termination of Mother's Parental Rights*

"[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.E.d2d 49 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 91 (Ind. Ct. App. 2014). As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that there is a reasonable probability that the conditions which resulted in the child's removal and continued placement outside the home will

not be remedied by the parents and that termination is in the best interests of the child. Ind. Code §§ 31-35-2-4(b)(2)(B)(i), (C); 31-37-14-2. We address each of those factors in turn.

### 1. *Reasonable Probability Conditions Will Not Be Remedied*

Before turning to the evidence supporting the trial court's determination, we note that the trial court also found that a reasonable probability existed that the continuation of the parent-child relationship posed a threat to Child's well-being, another of the factors that may be shown under subsection 31-35-2-4(b)(2)(B). This subsection is written in the disjunctive, so a trial court need only find one of the factors enumerated there. Mother does not challenge the validity of this conclusion by the trial court, and she has, therefore, waived her claim that DCS failed to meet its evidentiary burden under this subsection. *See A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013) (finding issue waived for failure to make a cogent argument), *trans. denied*. Nevertheless, given the importance of the interests involved, we will address the evidence supporting the trial court's conclusion regarding the probability that the conditions that merited removal will not be remedied.

When reviewing a trial court's determination that the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-43. First, we must identify the conditions that led to removal; second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. When engaging in the second step of this analysis, a trial court must judge a parent's fitness as of the

time of the termination proceeding, taking into account evidence of changed conditions, and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. This delicate balance is entrusted to the trial court, and a trial court acts within its discretion when it weighs a parent's prior history more heavily than efforts made only shortly before termination. *Id*. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id*. In making its determination, the trial court may consider the services offered to the parents and the parents' response to those services. *In re W.M.L.*, 82 N.E.3d 361, 367 (Ind. Ct. App. 2017).

[29] Here, the primary issue necessitating removal of Child was Mother's drug and alcohol use. DCS's initial involvement with this family and subsequent CHINS determination in 2015, the 2017 DCS informal adjustment, and the March 6, 2018, removal of Child from Mother's care were all the result of Mother abusing alcohol and illegal substances. Mother was offered substance abuse evaluations, IOP, random drug screens, and individual and group therapy to address her substance abuse. Mother was unsuccessfully discharged from treatment at the Samaritan Center and Brentwood Springs following her informal adjustment. Mother was referred again to Samaritan Center but never engaged in services there. Following the March 6, 2018, removal of Child, Mother failed to engage in the referred group and individual therapy at Samaritan Center recommended to treat her substance abuse issues, and she

was yet again unsuccessfully discharged. In October of 2018, Mother was referred to programs at LifeSprings, but she continued to use methamphetamine and alcohol and was unsuccessfully discharged from those services as well.

[30] Thus, Mother had a pattern of unsuccessful treatment throughout the CHINS proceedings. "We have often noted that evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change." *S.S.*, 120 N.E.3d 605, 611 (Ind. Ct. App. 2019). Nevertheless, Mother argues that her failures were due to not being placed in the in-patient treatment she requested but was denied after being told that DCS did not provide that service. This argument is unpersuasive for at least two reasons. First, there was conflicting testimony regarding whether DCS would provide in-patient treatment. PCM Rhoads testified that DCS had spoken to Mother on August 9, 2018, about entering in-patient treatment which they would find for her if she wished, but that Mother had declined that treatment. This is the evidence that supports the trial court's findings and judgment, so it is the only evidence we consider on appeal. *See In re E.M.*, 4 N.E.3d at 642. In addition, the failure of DCS to provide a particular service during the underlying CHINS proceedings cannot be the basis for attacking the validity of an order terminating parental rights. *See In re J.W., Jr.*, 27 N.E.3d at 1190.

[31] After Mother was incarcerated following her December 30, 2018, arrest, she was again referred for programs and treatment. Mother argues that the trial

court failed to sufficiently credit her progress while incarcerated. However, it was within the trial court's discretion to weigh Mother's history of failed compliance with substance abuse treatment more heavily than any recent improvements. *E.M.*, 4 N.E.3d at 643. Indeed, although Mother had shown some improvements after being incarcerated, she came to a parenting time session on January 19, 2019, smelling of alcohol, tested positive for alcohol on February 18, 2019, and submitted a diluted urine sample as late as April 2019. All of these events occurred after the petition to terminate her parental rights had been filed, and all occurred even though she was in the controlled environment of her work release placement. PCM Rhoads testified that she was concerned that Mother did not make any progress in addressing her substance abuse issues when she was free in society and had only shown improvement after being placed in work release. The trial court reasonably concluded in light of this evidence that Mother's long-term history of failure to address her substance abuse outweighed her very recent improvements and, thus, that there was a reasonable probability that this condition of removal would not be remedied.

[32] We come to the same conclusions regarding the other reasons for removal— Mother's mental health, her lack of stable housing, and the instability of her employment. Mother was prescribed an anti-depressant as part of the DCS informal adjustment, but she did not take it. Following Child's removal, Mother was diagnosed with depression after an evaluation at the Samaritan Center but did not engage in the therapy to which she was referred. Mother did

not attend therapy consistently until after being incarcerated. She did not begin taking her medication consistently until two or three weeks before the May 29, 2018, fact-finding hearing in this matter. The trial court was not obligated to overlook Mother's long-term pattern of failing to address her mental health in favor of this recent short-term compliance. *See id*.

[33] In addition, Mother made little progress addressing her housing and employment stability. Mother moved four times during the CHINS proceedings. She only attended one-third of the parenting aide sessions meant to help her with her housing. Mother's plan after finishing work release was to live in the apartment where Crays, the boyfriend who she had been arrested for stabbing with a paring knife and who himself had a substantiated DCS history for sexual activity with a child, was still living and had his name on the lease. Mother was not truthful with her service providers about ending the relationship and professed not to understand why this living arrangement would not be approved by DCS.

[34] Mother also failed to maintain stable employment, as, prior to her December 30, 2018, arrest she had at least four jobs in quick succession. She was fired from her job at Jasper Rubber for fighting with her superior. While she was on work release, Mother worked at a fast-food restaurant for three months but was fired for drinking alcohol on the job and allowing Crays to loiter there. Although she was employed at the time of the second fact-finding hearing, the trial court was within its discretion to recognize and credit Mother's long-term history of employment instability. *See id*. Given the evidence of Mother's long-

term failure to address her substance abuse, mental health, housing, and employment issues, we find that the trial court's conclusion that there was a reasonable probability that the conditions meriting removal would not be remedied was supported by the evidence.

### 2. *Child's Best Interests*

[35]    Mother also challenges the trial court's conclusion that termination of her parental rights was in Child's best interests. Our supreme court has recently recognized that one of the most difficult aspects of a termination of parental rights determination is the issue of whether the termination is in the child's best interests. *Id.* at 647 (noting that the question "necessarily places the children's interest in preserving the family into conflict with their need for permanency"). The trial court's determination that termination was in the child's best interests requires it to look at the totality of the evidence of a particular case. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "In doing so, the trial court must subordinate the interests of the parents to those of the children involved." *Id*. The court is not required to wait until the child is irreversibly harmed before terminating the parent's rights. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In addition, a recommendation by the case manager or the child's advocate that the parent's rights should be terminated, together with evidence that the conditions that merited removal will not be remedied, is sufficient to sustain a trial court's determination that termination is in the child's best interests. *In re J.C.*, 134 N.E.3d 419, 433 (Ind. Ct. App. 2019).

[36] We have already concluded that there was sufficient evidence that there was a reasonable probability that the conditions meriting Child's removal would not be remedied. PCM Rhoads felt that Child's adoption by her foster parents was in Child's best interests. CASA Frances also testified that adoption by foster parents was in Child's best interests because Mother did not have a demonstrated long-term history of stability outside of a controlled environment. This evidence alone was sufficient to support the trial court's "best interests" determination. *See id*.

[37] Other evidence buttressed the trial court's conclusion. Child was thriving in the home of her foster parents. Her educational concerns had been resolved, she was attending school regularly, had a routine, and felt safe. Child was bonded to both foster parents and to the other foster child in the home, whom Child looked upon as her little sister. Child was receiving the stability in her foster home that Child's therapist felt was "the number one factor[]" for Child. (Tr. Vol. III, p. 71). We conclude that the totality of the evidence supports the trial court's findings and conclusions that termination of Mother's parental rights was in Child's best interests. *See In re D.D.*, 804 N.E.2d at 267.

## CONCLUSION

[38] Based on the foregoing, we conclude that Mother's due process rights were not infringed upon by the timing of the filing of DCS' petition to terminate her parental rights and that the evidence supported the trial court's Order.

[39] Affirmed.

Baker, J. and Brown, J. concur