

FILED

08/31/2017, 10:23 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| APPELLANT, PRO SE<br><br>Roberta L. Renbarger<br>Fort Wayne, Indiana | ATTORNEY FOR APPELLEE<br>(MOTHER)<br><br>Donald J. Frew<br>Fort Wayne, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: the Termination of the Parent-Child Relationship of W.M.L. and A.J.L.<br><br>R.R. (Guardian ad Litem),<br><br>*Appellant-Petitioner,*<br><br>v.<br><br>E.L. (Mother), O.H. (Father), et al.,<br><br>*Appellees-Respondents.* | August 31, 2017<br><br>Court of Appeals Case No.<br>02A03-1703-JT-479<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Charles F. Pratt, Judge<br><br>Trial Court Cause Nos.<br>02D08-1603-JT-53<br>02D08-1603-JT-54 |

**Pyle, Judge.**

## Statement of the Case

Guardian Ad Litem, Roberta Renbarger, ("GAL Renbarger") appeals the trial court's denial of the Department of Children's Services' ("DCS") petition to terminate the relationship between parents, E.L. ("Mother") and O.H. ("Father"), and their children, W.L. ("W.L.") and A.H. ("A.H.") (collectively "the children"). Concluding that the trial court did not err in denying DCS's petition to terminate the parent-child relationships, we affirm the trial court's judgment.

We affirm.

## Issue

Whether the trial court erred in denying DCS's petition to terminate the parent-child relationships.

## Facts

The evidence most favorable to the judgment reveals that Mother and Father are the parents of son, W.L., who was born in October 2008, and daughter, A.H., who was born in May 2012. Both children were removed from Mother and Father shortly after A.H.'s birth when it was discovered that Mother had used marijuana during her pregnancy and that the family was homeless. The

children were adjudicated to be Children in Need of Services ("CHINS"), and both parents were court-ordered to participate in services.

[4] The children were returned to their parents' home in July 2013. However, in September 2013, the police arrested Father for battering Mother. The children were removed from the home and placed in foster care. Father was convicted of domestic battery and placed on probation until September 2014. He was also restrained, under a no-contact order, from having any contact with Mother. Both parents were ordered to refrain from criminal activity, maintain clean and appropriate housing, and cooperate with all service providers. Mother and Father were also ordered to obtain diagnostic assessments, obtain drug and alcohol assessments, enroll in and successfully complete home-based services programs, refrain from the use of alcohol and illegal drugs, and attend all visits with the children. Mother was further ordered to obtain and maintain employment and to enroll in non-violence counseling at the Center for Nonviolence. Father was also ordered to attend and complete a specific program at the Center for Nonviolence.

[5] In March 2016, DCS filed a petition to terminate the parental relationship between Mother and Father and their children, W.L. and A.H.[1] The trial court held five days of hearings from August to November 2016. Testimony at the

---

[1] Mother and Father are also the parents of E.H., who was born in January 2016. At the time of the termination hearing, he had been adjudicated to be a CHINS but was not the subject of a termination petition.

hearings revealed that Father had completed a six-month batterer's intervention program at the Center for Nonviolence in 2014 and had successfully completed the probation imposed following his domestic battery conviction. He had also completed a five-month substance abuse group program two weeks before the termination hearing. In addition, Father had worked for the same roofing company for several years.

[6] The testimony further revealed that Mother had completed a five-month substance abuse program in 2013. She had also completed a program that had required her to complete applications for Social Security disability, food stamps, and Medicaid. At the time of the hearing, Mother was attending substance abuse counseling twice a week. She also had a full-time job with a lawn care service. Mother testified that although she still took prescribed methadone for pain for her physical ailments, including multiple sclerosis, hip dysplasia, rheumatoid arthritis, and osteoarthritis, she had not used illegal substances for the past year. According to Mother, she was "willing to do whatever it t[ook] to be better for [herself] so [she could] be better for [her] children." (Tr. 114).

[7] In addition, Mother and Father, who had been together for sixteen years, had recently gotten married and were living together in a three-bedroom house. Both parents regularly visited W.L. and A.H. Therapist Nicole Gaunt ("Therapist Gaunt"), who treated Mother and supervised the parents' visitation with their children, testified that the children were "ecstatic" to see their parents and that W.L. had asked multiple times when he could "move back home with his mom and dad." (Tr. 142). She also explained that the parents engaged in

imaginary play with their children and made a "good team as parents." (Tr. 146). She recommended allowing the children to visit their parents at the parents' home. Gaunt further testified that Mother had a home with Father and a job and was paying her bills. According to Gaunt, Mother's life was as stable as it had ever been. Gaunt also testified that termination of the parent-child relationships would be detrimental to the children.

[8] The children's foster mother testified that Mother and Father had kept in regular communication with the children and that W.L. had a good bond with Father. She further testified that it was evident that Mother and Father loved their children.

[9] DCS Family Case Manager Ashley Nichter ("Case Manager Nichter") testified that Father had: (1) maintained contact with her; (2) always been employed; (3) never had a positive drug screen; (4) completed a diagnostic assessment; (5) completed counseling; (5) maintained stable and appropriate housing; and (6) completed a home-based services program. Nevertheless, she recommended terminating Mother's and Father's parental rights because she was concerned about Mother's current methadone use and past drug abuse. She further acknowledged that Father had completed the required services but was concerned whether he had benefited from them.

[10] GAL Renbarger also recommended terminating Mother's and Father's parental rights because she believed that Father had not benefited from the domestic violence program. However, GAL Renbarger further testified that she had

never met Mother, Father, W.L., or A.H. She had only met the children's foster mother.

[11] After hearing the evidence, the trial court issued a ten-page, single-spaced order, which provides, in relevant part, as follows:

> The parents' ability to care for the children at the time of the Factfinding is determinative. (*Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), trans. denied.) By the time of the close of the bifurcated Factfinding, the parents had demonstrated substantial progress with their services. The Father had remained drug and alcohol free. He had maintained his employment and had secured a safe and stable home. The Mother was involved in her therapies and had refrained from the use of non-prescribed controlled substances and/or illegal substances. They have been living together without any report of domestic violence. They have made substantial progress in therapeutic visitations with their children and were poised to participate in in-home supervised visits if referred by the Department. However, there was no evidence from any service provider that the children could not be safely returned to the care of the parents at the time evidence was closed. There was optimism by Therapist Nicole Gaunt that reunification could eventually be achieved. In determining whether or not the conditions that resulted in the children's removal will be remedied[,] the Court may consider the parties' habitual patterns of conduct. (*J.K.C. v. Fountain County Department of Child Welfare*, 470 N.E.2d 88 (Ind. Ct. App. 1984). In this case, the Father has been able to demonstrate that he can provide for his children.
>
> The issue has been the Mother's lack of cooperation with the Center for Non Violence services and her abuse of controlled substances. The Mother's inability to manage her anger has also been a chronic issue that has frustrated reunification. The Court

notes, however, that she has recently begun to address her emotional challenges and has made progress in therapy. The Father has expressed his love for and his commitment to the children's mother. They intend to remain together. The Father's desire to remain with this wife is not sufficient to terminate his parental rights. (*In re V.A.*, 51 N.E.3d 1140 (Ind. Sup. Ct. 2016).

(App. 26). The trial court denied DCS's petition to terminate the parent-child relationships, thereby determining that DCS had failed to meet its burden. In addition, the trial court ordered DCS to consider another permanency plan that did not permanently sever the children's relationships with their parents. GAL Renbarger appeals.[2]

## Decision

[12] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *Bester v. Lake Cty. Office of Family and Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Indeed, the parent-child relationship is "one of the most valued relationships in our culture." *Id.* We recognize, however, that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate

---

[2] DCS filed a notice of intent not to file an appellee's brief. Mother filed an appellee's brief but did not challenge the GAL's authority to appeal in place of DCS. Father did not file an appellant's brief.

parental rights. *Id.* Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2014), *trans. denied*).

[13] When reviewing the termination of parental rights, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Bester*, 839 N.E.2d at 147. We do not reweigh the evidence or judge witness credibility. *Id.* We also give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[14] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child

being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2).

[15] The burden of proof in termination of parental rights cases is one of "clear and convincing evidence."[3] *Bester*, 839 N.E.2d at 147. In other words, if the State

---

[3] In its notice of intent, DCS conceded that if it had challenged the trial court's denial of its petition to termination the parent-child relationships in this case, it would be appealing a negative judgment and would need to show an error of law to prevail. DCS further acknowledges that it could not meet its burden. DCS is correct. In *Smith v. Dermatology Assocs. of Fort Wayne, P.C.,* 977 N.E.2d 1, 4 (Ind. Ct. App.2012), we explained that:

A judgment entered against a party who bore the burden of proof at trial is a negative judgment. *Garling v. Ind. Dep't of Natural Res.,* 766 N.E.2d 409, 411 (Ind. Ct. App. 2002), *trans. denied.* On appeal, we will not reverse a negative judgment unless it is contrary to law. *Mominee v. King,* 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994). To determine whether a judgment is contrary to law, we consider the evidence in the light most favorable to the appellee, together with

fails to prove any one of these four statutory elements, then it is not entitled to a judgment terminating parental rights. *Angela B. v. Lake Cty. Dep't of Child Servs.,* 888 N.E.2d 231, 239 (Ind. Ct. App. 2008), *trans. denied*.

[16] When the trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside a trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts or inferences to be drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

---

all the reasonable inferences to be drawn therefrom. *J.W. v. Hendricks Cnty. Office of Family & Children,* 697 N.E.2d 480, 482 (Ind. Ct. App. 1998). A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different from that reached by the trial court. *Mominee*, 629 N.E.2d at 1282.

However, DCS apparently believes that because GAL Renbarger was not the petitioner in this case, the contrary to law standard does not apply to her appeal. We need not determine whether the contrary to law standard applies to an appellant who was not a petitioner because: (1) Mother and Father do not argue that they are entitled to this less stringent standard of review; and (2) we affirm the trial court's denial of the termination petition even when we apply the more stringent standard.

[17]     Here, GAL Renbarger argues that the trial court erred in denying DCS's termination petition. She specifically contends that the "dispositive determination is whether the conditions that supported the children being removed or the reasons for out of home placement have been remedied." (GAL Renbarger's Br. 21). According to GAL Renbarger, DCS met its burden to prove that there was a reasonable probability that the conditions that resulted in the children's placement outside the home would not be remedied.

[18]     In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.*

[19] Here, our review of the evidence most favorable to the trial court's judgment reveals that the children were first removed from Mother and Father in 2012 because Mother had used marijuana during her pregnancy with A.H. and the family was homeless. The children were returned to the home but then removed again in 2013 after Father battered Mother.

[20] Evidence at the termination hearing revealed that at the time of the hearing, Father had completed a batterer's intervention program as well as the probation imposed following his domestic battery conviction. He had also completed a substance abuse group and had worked for the same roofing company for several years. He had never had a positive drug screen. Mother had also completed court-ordered programs and had a full-time job with a lawn care service. She had not used illegal substances for the past year and was willing to do "whatever it took" to be a better parent. (Tr. 114).

[21] Further, Mother and Father, who had been together for sixteen years, had recently gotten married and were living together in a three-bedroom home. Both parents regularly visited W.L. and A.H. Therapist Gaunt, who supervised the visitation, explained that the children were "ecstatic" to see their parents, and W.L. had asked multiple times when he could "move back home with his mom and dad." (Tr. 142). She also explained that the parents engaged in imaginary play with their children and made a "good team as parents." (Tr. 146). She recommended allowing the children to visit their parents at the parents' home. Therapist Gaunt further testified that Mother had a home with Father and a job and was paying her bills. According to Therapist Gaunt,

Mother's life was as stable as it had ever been. Therapist Gaunt also testified that termination of the parent-child relationships would be detrimental to the children.

[22] Because this evidence supports the trial court's conclusion that DCS did not meet its burden to prove that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied, the trial court did not err in denying DCS's petition to terminate the parent-child relationships. GAL Renbarger's arguments are nothing more than a request that we reweigh the evidence, which we cannot do. *See Bester*, 839 N.E.2d at 147.

[23] Affirmed.

Riley, J., and Robb, J., concur.