

IN THE

# Court of Appeals of Indiana



FILED

Dec 12 2025, 9:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

In the Matter of the Termination of the Parent-Child Relationship of A.L., Mother, J.T., Father, and B.T., Child,

A.L. and J.T.,

*Appellants-Respondents*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 12, 2025

Court of Appeals Case No.
25A-JT-663

Appeal from the Jay Circuit Court

The Honorable Brian D. Hutchison, Judge

Trial Court Cause No.
38C01-2410-JT-19

**Opinion by Judge Foley**
Judges Kenworthy and Scheele concur.

**Foley, Judge.**

A.L. ("Mother") and J.T. ("Father") (together, "Parents") appeal the trial court's order terminating their parental rights to B.T. ("Child"). Parents raise the following restated issue for our review:

> I. Whether clear and convincing evidence supported the judgment.

Additionally, Father raises the following restated issue for our review:

> II. Whether Father received proper notice of the termination fact-finding hearing.

Finding error, we affirm in part, reverse in part, and remand.

## Facts and Procedural History

Child was born in April 2023, and at the time of Child's birth, Parents had been in a relationship for more than five years. In addition to Child, Mother has two other biological children that are not subject to this termination proceeding.[1]

---

[1] One child lives with his biological father who maintains a guardianship over him, while the other child resides with his maternal great-grandmother without any legal arrangement. *See* Tr. Vo1. II pp. 109, 176, 178.

Parents and Child lived in a home in Pennville. During the course of Parents' relationship, Father had "bouts" of domestic violence with Mother which often left Mother with "bruises . . . around her face" in the shape of finger prints and "bruises on her arms[.]" Tr. Vol. II pp. 33, 78, 79. Mother's employer observed Mother with "a huge gash on her head" from Father, and explained that Mother once told her that Father "put her head on the counter like it bounced off the counter." *Id*. at 78, 78–79. On another occasion, while riding in a vehicle with Mother's grandmother, Parents argued about Mother's engagement ring, which Mother refused to return to Father. Father threatened to cut Mother's finger off and then Father started to choke Mother with a seatbelt. *See id*. at 111. Father's violence was not limited to Mother, and on one occasion, Father hit Mother's grandfather in the eye for "lyin[g]" to Father. *Id*. at 108.

After Child was born, Mother was working as a server at a restaurant ("the Restaurant") but often had to leave work early because Father refused to watch Child. *See id*. at 78. Father frequently called the Restaurant while Mother was working "just to yell and curse at [Mother]." *Id*. Mother's employer eventually connected Mother with a babysitter to assist Mother with childcare. When Child was three to four months old, Child began going to the babysitter while Mother was at work.

On October 2, 2023, while Child was at the babysitter's home, Mother was arrested for Level 5 felony possession of methamphetamine and Level 6 felony maintaining a common nuisance—controlled substances. *See* Father's App.

Vol. 2 p. 90. At the time of her arrest, Mother was also on probation after pleading guilty on May 30, 2023, to maintaining a common nuisance— controlled substance, a Level 6 felony. *See id*. at 99–100. At that time, Father was incarcerated after pleading guilty to unlawful possession of a syringe. *See id*. at 112–13. Mother admitted to DCS that she used both methamphetamine and marijuana while Child was in her care. Based upon the above, the Indiana Department of Child Services ("DCS") removed Child without a court order and placed Child in the care of the babysitter, who, with her husband, eventually became Child's foster parents ("Foster Parents"). *See* Transcript Vol II pp. 93, 94. The next day, DCS filed a verified petition alleging Child was a Child in Need of Services ("CHINS") because Parents were both presently incarcerated, and Mother was recently arrested on a drug-related offense. *See* Father's App. Vol 2 pp. 139–41.

[8] Parents admitted the allegations in the petition, and the trial court adjudicated Child a CHINS on November 8, 2023. *See id*. at 161. On November 30, 2023, the trial court held a dispositional hearing and, on December 5, 2023, the trial court issued its dispositional order, in relevant part, ordering Parents to contact Family Case Manager Rhonda Decker ("FCM Decker") on a weekly basis; notify FCM Decker of any change in address; keep all appointments with service providers; maintain suitable, safe, and stable housing; abstain from illegal drug use and only consume controlled substances that have been prescribed; complete a parenting assessment and successfully complete any recommendations; complete a substance abuse assessment and successfully

complete any recommendations; submit to random drug screens; not commit acts of domestic violence; and actively participate in and successfully complete any recommendations from the domestic violence assessment or program. *Id*. at 164–68.

[9] On March 1, 2024, Mother pleaded guilty to Level 5 felony possession of methamphetamine, and on April 5, 2024, was sentenced to the Indiana Department of Correction ("the DOC") for a term of three years. *See id*. at 94, 95. Mother's sentence was to be served consecutive to the sentence imposed in her pending felony probation case. On March 26, 2024, Mother admitted to violating her probation and was sentenced to an additional 422 days of incarceration. Mother remained at the DOC during the entirety of the case and testified at the fact-finding hearing that her projected release date was June of 2026.

[10] On May 24, 2024, Father was released from the DOC and returned to his home in Pennville, which had running water but no electricity. After a few days, Father left his residence because it was "trashed[,]" and people were "squattin[g]" in it. Tr. Vol. II p. 36. In June 2024, Father went to Grace House to participate in a twenty-eight-day in-patient recovery program. Father left Grace House after a few days and "against medical advice." *Id*. at 119–20. After Father left Grace House, he went to Florida for about a month to live with his sister. Eventually, Father returned to Indiana and stayed with friends and family before returning to the Pennville residence, which still lacked electricity, in September 2024.

[11]     On August 27, 2024, DCS filed a Verified Information for a Rule to Show Cause against Father because he "failed to remain in weekly contact with the FCM and failed to comply with services." Father's App. Vol. 2 p. 172. The trial court conducted a show cause hearing on September 27, 2024, and found Father in contempt. As a sanction, the trial court imposed a sixty-day suspended jail sentence, so long as Father did not further violate the court's orders.

[12]     On October 9, 2024, DCS filed its petition to terminate Parents' parental rights ("TPR") to Child and that same day, the guardian ad litem ("the GAL") filed an appearance on behalf of Child. *See id*. at 17–19, 30. On October 18, 2024, the trial court held an initial hearing on the TPR petition. Parents appeared without counsel, with Father appearing in person and Mother appearing by video from the DOC. At the hearing, Parents were appointed pauper counsel and advised that their next hearing would take place on November 8, 2024. Parents appeared telephonically at the November 8 hearing and their attorneys appeared in person. The trial court advised Parents and counsel that a fact-finding hearing on the TPR petition would be held on January 14, 2025. *See* Tr. Vol. II pp. 17–21.

[13]     In November 2024, Father enrolled in an in-patient drug rehabilitation program at the Bridges of Hope. *Id*. at 42. Father completed a twenty-eight-day rehabilitation program at the Bridges of Hope from November 5, 2024, until December 3, 2024. On December 3, 2024, Father transitioned into the House of Hope, a sober living facility. Father failed to comply with the requirement to

search for employment and left the House of Hope after two weeks. Father then moved to another sober living facility called the Growth House. At Growth House, Father was required to complete daily chores, maintain employment, attend five weekly AA meetings, and attend a mandatory house meeting. Although Father participated in Growth House's weekly and required programming, he failed to stay current on his $150 weekly dues. On January 15, 2025, after residing at Growth House for approximately one month and falling several weeks behind on dues, Father was asked to leave.

[14] After leaving Growth House, Father moved to Mockingbird Hill, a sober living facility located in Anderson that provides "psychiatry, therapy, addictionology, 12 step group supports[,]" and peer recovery specialists working at the facility. *See id.* at 63, 208, 212. Father also began working part-time for General Motors through a staffing agency and provided two pay stubs from December of 2024 to verify his employment.

[15] The fact-finding hearing was held over the course of two days, January 14, 2025, and February 7, 2025. Mother and Father both personally appeared and were represented by counsel. Mother remained incarcerated at the DOC and explained that her earliest possible release date was June 25, 2026, but hoped to modify her sentence to an earlier release date. Mother testified that during her incarceration she was participating in recovery while incarcerated, parenting classes, attending six peer groups a week, earned her GED, and read self-help books. Mother had been continuously incarcerated since her arrest in October 2023 and had not seen Child since.

[16] Father completed a substance abuse disorder assessment with Meridian Health Services ("Meridian") on November 1, 2024. Meridian recommended Father complete "[i]npatient treatment if he could not successfully maintain sobriety in an outpatient setting[.]" *Id*. at 27. Father failed to show up for follow-up appointments with Meridian scheduled for January 8, 2025, and January 22, 2025.

[17] After being released from the DOC, Father had resided at seven different residences and failed to inform FCM Decker each time he moved. Since the dispositional order was issued in December 2023, FCM Decker explained that Father had not addressed his addiction or mental health; maintained safe and suitable housing; completed a parenting assessment; engaged in therapy; and still had outstanding court ordered services to complete. *See id*. at 188, 190, 194. However, Father did participate in court ordered drug screening. At Grace House, on June 6, 2024, Father was screened and tested positive for THC. *See* Mother's App. Vol. II pp. 229–30. FCM Decker explained that Father was "screened when he's come in for visits." Tr. Vol. II p. 200. Despite Father's participation in drug screening, he continued to test positive for drug use on several occasions. Specifically, Father tested positive on: August 30, 2024, for THC; September 27, 2024, for amphetamine, methamphetamine, and THC; October 11, 2024, for amphetamine, methamphetamine, and THC; and October 18, 2024, for methamphetamine. *See* Father's App. Vol. 3 pp. 65–85. Father was not offered drug screening in November 2024 because he was residing at a sober living facility. On December 3, 2024, Father took a drug

screen at the House of Hope, and tested negative for all substances. Mother's App. Vol II p. 167. On December 16, 2024, Father was screened by DCS and again, tested negative for all substances. Father's App. Vol. 3 p. 69.

[18] After his release from the DOC, Father was offered supervised visits with Child. From May 2024 through the termination hearing, Father visited Child on seven occasions and canceled scheduled visits on three other occasions. *See* Tr. Vol. II p. 192. One of Father's supervised visits was with FCM Decker and Father then arranged for four supervised visits with a subcontractor from the Youth Development Project Agency ("Youth Development"). Youth Development was no longer able to supervise Father's visits because Father planned to move to sober living in a different city and Youth Development could not supervise the visits due to the increased drive time. Youth Development also explained that Father "never gave [him] a straight answer on when he was going [to sober living]." *Id*. at 166. Father's supervised visitation did not resume until December 2024 because FCM Decker "didn't wanna [sic] really put in visits until – or anything like that until we knew he had an address." *Id*. at 197.

[19] After Child was removed from Parents' care, Foster Parents took Child to appointments with her primary care physician. Foster Mother explained that, after DCS placed Child in her care, Child "[frequently] threw up." *Id*. at 95. Foster Parents took Child to a chiropractor as treatment for issues that may be the cause of Child's vomiting issues. After seeing a chiropractor three times weekly, Child began to improve. Foster Mother explained that the chiropractor

appointments "really seemed to be the only thing that slowed down the vomiting and helped us keep food in." *Id*. at 97. Child no longer has issues vomiting and Foster Parents have expressed a desire to adopt Child.

[20] FCM Decker testified at the hearing that Child could not be placed with Father due to "instability" and could not be placed with Mother due to her incarceration. *Id*. at 195. FCM Decker expressed safety concerns for Child if she were placed back with Parents due to drugs, instability, and the inability to meet Child's needs. *See id*. DCS's permanency plan for Child was adoption by the Foster Parents. FCM Decker concluded that it was not best for Child to continue to wait for permanency because Child "deserves to-to have a stable home and then she already ha[d] attachment with the [foster] family." *Id*. at 196.

[21] The GAL agreed with DCS's recommendation, testifying that Father's "current state . . . it's not up to the level that this Court's used to seeing. Trying to be reunited with his child. I-I-the instability is too great there[.]" *Id*. at 226. As to Mother, the GAL observed that Mother's incarceration was "self explanatory" and an "overwhelming challenge." *Id.*

[22] On February 19, 2025, the trial court issued its Order terminating the Parents' parental rights to Child. The Order contained the trial court's findings of facts and conclusions of law. The trial court concluded that "[t]here is a reasonable probability that the conditions that resulted in the [C]hild's removal or the continued placement outside the home will not be remedied[,]" and that

"[t]ermination of parental rights is in the Child's best interests[.]" Father's App. Vol. 3 p. 108. Finally, the trial court found that there "is a satisfactory plan for the care and treatment of the Child, that being Adoption." *Id.* Parents now appeal.

## Discussion and Decision

### I. Sufficient Evidence for Judgment

[23] Parents challenge the sufficiency of the evidence supporting the trial court's decision to terminate their parental rights. First, we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture." *Neal v. DeKalb Cnty. Div. of Fam. & Child.*, 796 N.E.2d 280, 285 (Ind. 2003) (quoting *Tillotson v. Clay County Dep't of Family & Children,* 777 N.E.2d 741, 745 (Ind. Ct. App. 2002), *trans. denied*). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cnty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). However, as our Supreme Court has observed, "this right is not absolute." *In re Ma.H.*, 134 N.E.3d 41, 45 (Ind. 2019) (citing *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Off.*, 989 N.E.2d 1225, 1230 (Ind. 2013)). Thus, "parental interests . . . must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester*, 839 N.E.2d at 147. "The purpose of terminating parental rights is not to punish the parent but to protect the child." *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). "The court need not

wait until the children are irreversibly harmed before terminating the parent-child relationship." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*.

[24] "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). "[W]e do not reweigh the evidence or judge witness credibility[,]" rather we consider "only the evidence and reasonable inferences that are most favorable to the judgment." *Bester*, 839 N.E.2d at 147. "When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second[,] we determine whether the findings support the judgment." *Id.* "[W]e will not set aside the trial court's findings or judgment unless clearly erroneous." *K.T.K.*, 989 N.E.2d at 1229; Ind. Trial Rule 52(A). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *In re G.M.*, 71 N.E.3d 898, 905 (Ind. Ct. App. 2017) (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)).

[25] Before an involuntary termination of parental rights can occur, the State must allege and prove:

> (1) the existence of one (1) or more of the circumstances described in subsection (d);

(2) that there is a satisfactory plan for care and treatment of the child; and

(3) that termination of the parent-child relationship is in the child's best interests.

Indiana Code section 31-35-2-4(c) ("the Termination Statute"). With respect to subsection (d) of the Termination Statute, DCS alleged:

(3) That there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(4) That there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being, safety, physical health, or life of the child.

I.C. § 31-35-2-4(d)(3),(4). The State "bears the burden of proving these allegations by clear and convincing evidence." *Bester*, 839 N.E.2d at 148. "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship." I.C. § 31-35-2-8(a). Due to Indiana Code section 31-35-2-4(d) being written in the disjunctive, the trial court need only find that one requirement of subsection (d) has been established by clear and convincing evidence. *See In re S.K.,* 124 N.E.3d 1225, 1233 (Ind. Ct. App. 2019)*, trans denied*.

[26] "We accept unchallenged findings as true." *In re W.H.*, 254 N.E.3d 549, 554 (Ind. Ct. App. 2025) (quoting *Henderson v. Henderson*, 139 N.E.3d 227, 232 (Ind.

Ct. App. 2019)).  Because Parents failed to challenge any of the trial court's factual findings, we accept the trial court's findings as true.

## A.    Removal Conditions Not Remedied

[27]    Parents each independently challenge the sufficiency of the evidence to support the trial court's conclusion that the conditions that resulted in Child's removal from the home and placement outside the home will not be remedied.  In order to determine if the trial court's conclusion is supported by sufficient evidence, we engage in a two-step analysis.  "First, we must ascertain what conditions led to their placement and retention in foster care.  Second, we determine whether there is a reasonable probability that those conditions will not be remedied."  *K.T.K.*, 989 N.E.2d at 1231 (quoting *In re I.A.,* 934 N.E.2d 1127, 1134 (Ind. 2010)), (internal quotation omitted).

[28]    The second step "requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation."  *In re W.M.L.*, 82 N.E.3d 361, 367 (Ind. Ct. App. 2017) (citing *In re E.M.,* 4 N.E.3d at 643).  "Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment."  *Id.* (citing *A.D.S.*, 987 N.E.2d at 1157).  Furthermore, our court has previously held that "individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their

children." *In re J.W.*, 259 N.E.3d 1039, 1046 (Ind. Ct. App. 2025) (internal brackets and quotations omitted) (quoting *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*), *trans. denied*.

[29] Here, Child was removed from Parents' home due to Father's incarceration and Mother's arrest, incarceration, and drug use. During its investigation, DCS discovered that Parents had an extensive history of domestic violence and substance abuse. At the time of the fact-finding hearing, Child remained outside the Parents' care since her removal, a period of approximately 15 months.

### 1.   Mother

[30] Mother argues that the trial court relied exclusively upon her incarceration to support its conclusion that the reasons for removal are unlikely to be remedied. Additionally, Mother argues that the trial court ignored her efforts— independent of DCS's involvement—to address her substance abuse issues and other issues through programming while incarcerated. Our Supreme Court has held that "incarceration is an insufficient basis for terminating parental rights." *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015). Rather, our Supreme Court has explained that "[b]ecause the release date alone is not determinative, we consider whether other evidence, coupled with this consideration, demonstrates by clear and convincing evidence a reasonable probability that [a parent] would be unable to remedy the conditions for removal." *Id*. at 648.

[31]     The trial court made the following findings in support of its conclusion that the conditions that led to Child's removal would not be remedied by Mother:

- Mother was incarcerated on the date of the [C]hild's removal, and she continues to be incarcerated today.

  . . . .

- Mother has not seen the Child since the child was less than 6 months old.

- Mother admitted to using methamphetamine in the house with the Child the day before her arrest.

- Mother did not provide guardianship or legal custody for the care of her other child, during her incarceration.

- Mother and Father engaged in domestic violence, which led to both still having pending cases in Madison County.

- Mother and Father have not engaged in services, or benefitted from services, so they have not improved their ability to safely parent [Child]. The same problems that existed on the date of removal still remain today and are not likely to be remedied.

Father's App. Vol. 3 p. 106. Mother was incarcerated for the duration of the CHINS case and was still incarcerated at the time of the fact-finding hearing. As a result, she was unable to participate in court-ordered reunification services with Child. *See* Tr. Vol. II p. 201. FCM Decker summarized Mother's compliance with the dispositional order as follows: "Well she's incarcerated.

She hasn't been able to do anything." *Id.* Despite FCM Decker's characterization, Mother did engage in programming and services offered by the DOC to improve her ability to parent Child.

[32] During her time in prison, Mother took advantage of available programing to improve her ability to care for Child. Mother obtained her GED, took parenting classes, attended six peer counseling groups a week, and was actively participating in the recovery while incarcerated substance abuse program. *See* Ex. Vol 3. pp.138–143; *see also* Tr. Vol. II p. 182. Mother's estimated release date was June 2026, but Mother indicated that she would seek a modification of her sentence based upon the completion of the recovery while incarcerated program. *See* Tr. Vol. II p. 184. Upon her release from the DOC, Mother explained that she planned to reside with her grandmother and find a job. At the close of Mother's testimony, she explained that she wanted Child back and that she has been doing "everything [she] can to better [h]erself for [her] children." *Id*. at 181.

[33] We find Mother's case to be analogous to *K.E.* There, our Supreme Court held that the termination court had failed to balance the incarcerated parent's habitual patterns of criminal behavior and substance abuse against his efforts to improve while incarcerated and concluded that DCS failed to meet its burden to prove that the parent could not remedy the conditions that led to the child's removal. While it is factually correct that Mother had not engaged in services from DCS, the trial court's conclusions that Mother had not engaged in

services, benefited from services, and had not improved her ability to parent Child are not supported by the evidence.

[34] The uncontroverted evidence is that Mother engaged in significant services and programming while she was in prison. There was no evidence presented regarding Mother's response to the programming she received while incarcerated or that despite the benefits of the programming, Mother's habitual patterns remained unchanged. At no point did the trial court attempt to balance the effect of the programming and services Mother completed while in prison against her habitual patterns. Both DCS and the trial court categorically disregarded the programming and services Mother engaged in while she was incarcerated. Given the efforts undertaken by Mother while incarcerated to improve her ability to parent Child, DCS has failed to meet its burden to prove that the conditions that resulted in the removal of Child from Mother had not been remedied.

[35] The factual findings in the trial court's order were insufficient to establish by clear and convincing evidence that Mother was unable to remedy the conditions that led to the removal of Child. We therefore conclude that the trial court erred in terminating Mother's parental rights. We reverse the trial court's order terminating Mother's parental rights.

[36] Having addressed the merits of what the trial court *did* find, we also briefly address what the trial court did *not* find. DCS alleged two circumstances supporting termination: failure to remedy removal conditions and threat to

Child's well-being. The trial court made findings as to only the remedy of conditions and, as noted above, clear and convincing evidence of one circumstance is all that is required. But given our decision that the trial court erred, we are left to wonder whether the court simply thought a finding about the threat to well-being was superfluous or whether it thought DCS did not prove that circumstance. *See* I.C. § 31-35-2-8(c) (requiring the court to enter findings that support its conclusions). To aid a court on appeal, it would be appropriate—and as illustrated by this case, perhaps beneficial—for a trial court to make findings on every circumstance DCS alleges, whether it finds the circumstance was established or not. Had we known where the trial court stood on the alternate circumstance, the result here might have been different.

[37]     Although the trial court made no specific determination about the continued parent-child relationship posing a threat to Child's well-being, it did find Mother used methamphetamine while Child was present and also found "Mother and Father engaged in domestic violence," resulting in charges filed against them.[2] Father's App. Vol. 3 p. 106. Both of these findings relate to Child's well-being and raise questions about Child's safety going forward that have not been addressed. This is especially true considering Father's rights have been terminated and it can be inferred from Mother's testimony that she intends to continue in a relationship with him after she is released.

---

[2] The charge against Mother arising from the incident the trial court referred to was for interference with the reporting of a crime.

[38]   DCS presented evidence of Father's significant, long-term violence toward Mother—before, during, and after Mother was pregnant with Child. *See* Tr. Vol. II pp. 78–79, 111–12. We recognize the adverse effects family violence can have on even very young children. *See E.M.*, 4 N.E.3d at 645 (holding that the trial court did not abuse its discretion in finding a father's violence against mother constituted abuse of the minor children residing in the household).[3] Reversal of the termination order as to Mother does not mean Child will be returned to Mother's custody immediately. The CHINS court still has

---

[3] In the support of its holding, our Supreme Court, pointed to the significant scientific and scholarly work in the field:

> "[M]any people assume that very young children are not affected at all" by violence between their parents, "erroneously believing that they are too young to know or remember what has happened." Joy D. Osofsky, *The Effects of Exposure to Violence on Young Children*, 50 Am. Psychologist 782, 783 (1995). But "even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders." *Id.* Indeed, "[t]he developing brain is most vulnerable to the impact of traumatic experiences" *before age one*—and during the first *three years*, those experiences actually change the organization of the brain's neural pathways. Abigail Sterne et al., *Domestic Violence and Children: A Handbook for Schools and Early Years Settings* 19 (2010) (citations omitted); Allan N. Schore, *The Effects of Early Relational Trauma on Right Brain Development Affect Regulation, and Infant Mental Health*, 22 Infant Mental Health J. 201, 209–10 (2001).

> A lack of beatings therefore does not equate to a lack of abuse, nor does the children's tender age equate to a lack of harm. Infants as young as fifteen months exhibit behavioral disturbances from spousal violence. Charles H. Zeanah, et al, *Disorganized Attachment Associated with Partner Violence: a Research Note.* 20 Infant Mental Health J. 77, 82–83 (1999). And for later infants and toddlers . . ., the symptoms are "very similar to post-traumatic stress disorder in adults." Joy D. Osofsky, *The Impact of Violence on Children*, 9 Domestic Violence & Children 33, 36 (1999) (citing Osofsky et al., *The Effects of Trauma on Young Children: A Case of Two–Year–Old Twins*, 76 Int'l J. Psychoanalysis 595 (1995)). But "[y]ounger children generally do not have the ability to express their feelings verbally"—so their "observable reactions . . . may not tally with their emotional reactions," and "[i]t may take some time before children are able to show any reaction at all" despite being affected. Sterne et al., *supra*, at 20.

*In re E.M.*, 4 N.E.3d 636, 644–45 (Ind. 2014).

jurisdiction to ensure Child's well-being and Mother will have the opportunity to demonstrate that she is committed and able to keep Child safe.

## 2.    Father

[39]    Father also argues that there was insufficient evidence to support the trial court's conclusion that the reasons for removal of Child from Father had not been remedied.  Father first argues that Child was removed due to his incarceration, and because he had been released, the reason for removal had been remedied.  Father additionally argues that he participated in services despite FCM Decker's "lack of referrals[,]" visited with Child on numerous occasions, completed the substance use disorder assessment, and was living in a sober environment at Mockingbird House.  Father's Br. p. 16.  Father relies upon his successful completion of services at Bridges of Hope, his participation in AA and NA meetings, his submission of drug screens, and his involvement in behavioral health therapy through Meridian Health services to demonstrate that he has remedied the conditions that resulted in the removal of Child. Additionally, Father provided two pay stubs, verifying his employment at General Motors through Rush Staffing.

[40]    Father's argument simply highlights those instances where he complied with the requirement of the trial court's dispositional order but neglects his nearly continuous inability to comply with all terms of the dispositional order.  Less than a month prior to the filing of the TPR petition, Father was found to be in contempt of court for failing to comply with court ordered services.  FCM Decker explained that Father's lack of referrals for services prior to September

2024[4] was because Father failed to maintain contact with her pursuant to the dispositional order. However, when Father did contact her, Father communicated to FCM Decker that he intended to go to a sober living facility located in another county. As a result, FCM Decker did not place referrals for Father until she knew where Father would be residing. *See* Tr. Vol. II p. 198. After his release from the DOC, Father failed to maintain suitable, safe, and stable housing. Father failed to notify FCM Decker when he moved and in less than one year, Father resided at seven different places, most of which were sober living facilities and group homes. Father was unable to secure housing suitable for living with Child.

[41]    Despite Father submitting to court ordered drug screens, he tested positive for either THC, amphetamine, or methamphetamine on four separate occasions. Father continued to test positive for illegal drugs after DCS filed its petition to terminate Father's parental rights on October 9, 2024. Additionally, Father never completed a court ordered parenting assessment. Although Father visited with Child on seven occasions, he cancelled three of the planned visits and never advanced beyond supervised visitation. *See id*. at 197. Father did enroll in mental and behavioral health services through Meridian, but failed to show

---

[4] FCM Decker testified that the first assessment she assigns to parents is the substance use disorder assessment "so that [Father would] be recommended for things." Tr. Vol. II p. 198. However, after completing the initial substance use disorder assessment, Father never completed the services recommended as a result of the assessment. Therefore, FCM Decker did not place referrals for Father's parenting assessment or his domestic violence assessment. *See id*. 194, 198–200; *see also* Mother's App. Vol. III pp. 6–7.

up for his scheduled behavioral therapy sessions on January 8, 2025, and January 22, 2025. *See id*. at 153.

[42] The trial court is tasked with judging "a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re W.M.L.*, 82 N.E.3d at 367 (citing *In re E.M.,* 4 N.E.3d at 643). Despite Father's partial compliance with the dispositional order, he failed to make appreciable improvement in his habitual conduct of drug abuse, domestic violence, lack of compliance with services, and inability to maintain suitable, safe, and stable housing. We conclude that there was sufficient evidence to support the trial court's conclusion that there was a reasonable probability that with respect to Father, the conditions that resulted in Child's removal from the home and placement outside the home will not be remedied.

## B. Best Interests

[43] Father also argues that there was insufficient evidence to support the trial court's conclusion that termination of his parental rights was in the best interests of Child. "In determining what is in the best interests of the Children, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and to look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship." *Id*. Our Court has previously held that "the recommendation by both the case manager

and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Id.* at 1158–59.

[44] The totality of the evidence reveals that at the time of the hearing, Father had not appreciably improved his ability to adequately care for Child. FCM Decker expressed concern for Child's well-being if she were returned to Father. The GAL agreed with FCM Decker and observed that Father's instability posed an additional challenge that is "too great[.]" Tr. Vol. II p. 226. Meanwhile, Child was doing well in her placement with Foster Parents, and Child's medical issues had subsided. FCM Decker stated that Child's attachment with Foster Parents is "great" and that the Child just "loves them. It's the best for [Child]." *Id*. at 195. Ultimately, FCM Decker concluded that it was not best for Child to continue to wait any longer for permanency because Child "deserves to-to have a stable home and then she already has the attachment with the family." *Id*. at 196.

[45] The trial court's conclusion that termination of Father's parental rights was in Child's best interest was supported by clear and convincing evidence.

## II.    Notice of the Fact-Finding Hearing

[46] Father asks this court to reverse the trial court's Order terminating the parent-child relationship because he was not served with notice of the fact-finding hearing ten days prior to the hearing. "Compliance with the statutory

procedure of the juvenile code is mandatory to effect termination of parental rights." *In re H.K.*, 971 N.E.2d 100, 103 (Ind. Ct. App. 2012) (quoting *In re T.W.,* 831 N.E.2d 1242, 1246 (Ind. Ct. App. 2005)). "Although statutory notice is a procedural precedent that must be performed prior to commencing an action, it is not an element of plaintiff's claim." *Id.* (internal quotations omitted). "[A] claim of inadequate notice under the statute is a defense that must be asserted." *In re D.P.*, 27 N.E.3d 1162, 1166 (Ind. Ct. App. 2015). Once notice is placed at issue, the plaintiff "bear[s] the burden of proving compliance with the statute." *Id.*

[47] Indiana Code section 31-35-2-6.5(b) provides that in matters relating to a child in need of services, notice must be served "[a]t least ten (10) days before a hearing on a petition or motion under this chapter[.]" A notice under this section is sufficient if it meets the requirements of Indiana Trial Rule 5, which governs the service of papers and pleadings subsequent to the initiation of an action. Indiana Trial Rule 5 authorizes service by U.S. Mail. *See In re C.C.*, 170 N.E.3d 669, 675–76 (Ind. Ct. App. 2021); T.R. 5(B) (stating "[s]ervice upon the attorney or party shall be made by delivering or mailing a copy of the papers to the last known address[.]").

[48] Both Father and his attorney were notified in open court of the fact-finding hearing at the November 8, 2024, pretrial hearing. At the conclusion of the hearing, the trial court advised Father, who appeared telephonically, and his counsel that the fact-finding hearing would take place on January 14, 2025. On January 6, 2025—eight days before the fact-finding hearing—DCS sent notice

by regular mail of the fact-finding hearing to Parents. Father and his attorney personally appeared at the fact-finding hearing and did not raise the issue of statutory notice or seek a remedy, such as a continuance of the hearing. Rather, Father, by counsel, proceeded to cross-examine witnesses and presented argument on the merits of the petition.

[49] In a similar case, *In re C.C.*, a parent was advised telephonically at her initial hearing and then subsequently in person at a pretrial hearing of the time and date for the termination hearing. Despite receiving actual notice of the hearing, the parent subsequently failed to appear and was represented by counsel, who "was able to make argument and cross examine witnesses" but "did not cross-examine witnesses on the issue of notice and made no arguments regarding notice." *In re C.C.*, 170 N.E.3d at 676. In that case, a panel of our court concluded that the parent waived the issue because she and her counsel failed to argue lack of statutory notice to the trial court. *See id*.

[50] Here, Father failed to raise the issue of untimely notice of the termination hearing before the trial court. Father and his attorney fully participated in the hearing, by calling witnesses, testifying, and making arguments and objections to the trial court. To the extent notice of the termination hearing failed to comply with the requirements of the statute, Father has waived the issue.

## Conclusion

[51] We conclude that the trial court erred in its judgment terminating Mother's parental rights to Child but find no such error as to the termination of Father's

parental rights. We also conclude that, by failing to present the statutory notice issue to the trial court, Father waived his argument regarding a lack of statutory notice.

[52] Affirmed in part, reversed in part, and remanded.

Kenworthy, J. and Scheele, J., concur.

ATTORNEY FOR APPELLANT A.L.

Joshua A. Brown
Muncie, Indiana

ATTORNEY FOR APPELLANT J.T.

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana